**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

James S. Lewis,                                    )
                                                   )      **ORDER DENYING UNITED STATES'**
          Plaintiff,                            )      **MOTION TO DIMISS**
                                                   )      **AMENDED COMPLAINT**
    vs.                                      )
                                                   )
United States of America,                          )
                                                   )      Case No. 1:20-cv-152
          Defendant.                          )

_____

       Before the Court is "The United States' Motion to Dismiss Plaintiff's Amended Complaint" filed on February 2, 2021. See Doc. No. 16. The Plaintiff filed a response to the motion on February 23, 2021. See Doc. No. 17. The United States filed a reply brief on March 15, 2021. See Doc. No. 22.[1] For the reasons set forth below, the Defendant United States' motion to dismiss the Plaintiff's amended complaint is denied.

I.      **BACKGROUND**

       Plaintiff James S. Lewis commenced this action against the United States to quiet title to the clinker, commonly known as "scoria," on lands owned by Lewis in McKenzie County, North Dakota, pursuant to the Quiet Title Act, 28 U.S.C. §2409a ("QTA"). See Doc. No. 14. The scoria at issue in this matter is located on two tracts of land:

    (1) S½ of Section 22 in Township 147 North, Range 103 West;

---

[1] The United States previously filed a motion to dismiss the Plaintiff's original complaint on December 29, 2020. See Doc. No. 11. Subsequent to the filing of the United States' motion to dismiss the complaint, the Plaintiff filed an amended complaint. See Doc. No. 14. The United States then filed the pending motion to dismiss the amended complaint. In support of its motion to dismiss the amended complaint, the United States incorporates its original motion to dismiss the complaint and the memorandum in support of such motion. See Doc. No. 16, p. 1.

(2) NE¼, N½NW¼, SE¼NW¼, E½SW¼, and W½SE¼ of Section 27 in Township 147
    North, Range 103 West.

<u>See</u> Doc. No. 14, ¶ 8.  Before Lewis acquired these lands from his parents by quit claim deed in

2014, the property had long been in his family since 1956.

On June 18, 1956, the United States granted the SW¼, N½ SE¼, and SW¼SE¼ of Section

22, NW¼NW¼ of Section 26, and the NE¼, N½NW¼, SE¼NW¼E½SW¼, and W½SE¼ of

Section 27 in Township 147 North, Range 103 West to Glenn McRae and Ellen McRae by

Exchange Deed pursuant to the Bankhead-Jones Farm Tenant Act ("BJFTA").  The Exchange

Deed reserved to the United States "all coal, oil, gas and other minerals, including sand, gravel,

stone, clay and similar materials. . . ."  <u>See</u> Doc. No. 11-1, p. 4.  In exchange for the lands acquired

from the United States in the Exchange Deed, the McRaes conveyed 800 acres of land to the United

States by Warranty Deed.  <u>See</u> Doc. No. 14, ¶ 10.  Then, on August 5, 1956, The SE¼SE¼ of

Section 22, Township 147 North, Range 103 West was first patented to Glen McRae and Ellen

McRae under the BJFTA.  <u>See</u> Doc. No. 17-4.  The Patent reserved to the United States "all coal,

oil, gas and other mineral in or under said lands, as authorized by the provision of Section 44 of

said Act."  <u>See</u> Doc. No. 16-2, p. 18.

On January 8, 1980, Ellen McRae entered into a Contract for Deed with William R. Lewis

and Donna J. Lewis for all of Section 22, the NW¼NW¼ of Section 26, and the NE¼, N½NW¼,

SE¼NW¼, E½SW¼, and W½SE¼ of Section 27 in Township 147 North, Range 103 West.  <u>See</u>

Doc. No. 17-5.  Pursuant to the Contract for Deed, William and Donna Lewis were to make yearly

payments to Ellen McRae with an executed warranty deed for the land held in escrow until the

contract was paid in full.  The lands were eventually transferred by warranty deed to William and

Donna Lewis. Then, on August 11, 2004, William and Donna Lewis granted all of Section 22, the

NW¼NW¼ of Section 26, and the NE¼, N½NW¼, SE¼NW¼, E½SW¼, and W½SE¼ of Section 27 in Township 147 North, Range 103 West to their son, James Lewis.  The warranty deed reserved "unto William R. Lewis and Donna J. Lewis and James F. Lewis, a life estate and the management, control, and right to income and profits of the above real property, for the remainder of the life of the survivor of William R. Lewis and Donna J. Lewis . . . ."  See Doc. No. 17-8, p. 2.  Then, on December 17, 2014, William and Donna Lewis granted James Lewis by quit claim deed all of the property described in the 2004 warranty deed.  See Doc. No. 17-9, p. 2.

According to the first amended complaint, Ellen McRae, and subsequently William and Donna Lewis, sold the scoria located on Section 22, Township 147 North, Range 103 West to McKenzie County beginning in 1974 and until 2007.  See Doc. Nos. 14, ¶ 15, and 17-10.  William and James Lewis also entered into agreements with other private entities between 2010 and 2013 for the removal and sale of the scoria located on Sections 22 and 27 of Township 147 North, Range 103 West.  See Doc. Nos. 14, ¶ 16, and 17-13, 17-14, 17-15.  However, in October of 2012, a representative of the United States Bureau of Land Management ("BLM") visited Lewis' property to discuss a possible mineral trespass in the S½ of Section 22, Township 147 North, Range 103 West.  See Doc. No. 14, ¶ 28.

Lewis received a letter from the BLM regarding the suspected mineral materials (specifically scoria) trespass in which the BLM stated "the United States is the owner of all minerals in the S½ sec. 22, T. 147, R. 130 W."  See Doc. No. 17-16.  The letter also indicated a BLM official would conduct an onsite inspection of the area.  Id.  A representative of the BLM and Lewis met at the site of the scoria pit located on S½ of Section 22, Township 147 North, Range 103 West on January 24, 2013.  See Doc. No. 17-17.  The BLM later sent a letter to Lewis on February 11, 2013, summarizing the discussions between the BLM and Lewis from the site visit

and requesting documents related to the mining of scoria on S½ of Section 22, Township 147 North, Range 103 West.   See Doc. Nos. 14, ¶ 32, and 17-17.   Throughout 2013, Lewis communicated with the BLM regarding the possible mineral trespass in S½ of Section 22, Township 147 North, Range 103 West.

Lewis then received another notice of possible mineral trespass from the BLM dated April 14, 2014, for the removal of scoria in the NE¼, N½ NW¼, SE¼NW¼, E½SW¼, and W½SE¼ of Section 27, Township 147 North, Range 103 West.   See Doc. No. 17-22.   According to the first amended complaint, Lewis did not respond to the BLM's letter notifying him of possible mineral trespass on Section 27.   See Doc. No. 14, ¶ 38.   Lewis had no further communications with the BLM regarding possible mineral trespasses described in the April 14, 2014 letter or the earlier letter of January 8, 2013.   Id.

Lewis commenced this action against the United States of America on August 17, 2020. See Doc. No. 1.   The sole cause of action in the complaint is to quiet title to the scoria on specific tracts of land in McKenzie County, North Dakota, namely:  (a) S½ of Section 22, Township 147 North, Range 103 West, and (b) NE¼, N½ NW¼, SE¼NW¼, E½SW¼, and W½SE¼ of Section 27, Township 147 North, Range 103 West.   See Doc. No. 1, p. 12.   The United States filed a motion to dismiss the complaint on December 29, 2020.   See Doc. No. 11.   Lewis then filed his first amended complaint on January 19, 2021.   See Doc. No. 14.   On February 2, 2021, the United States filed the pending motion to dismiss the first amended complaint.   See Doc. No. 16.   Lewis filed a response in opposition to the motion on February 23, 2021.   See Doc. No. 17.   The United States filed a reply brief on March 15, 2021.   See Doc. No. 22.

Against this backdrop, the Court now turns to consider the pending motion by the United States to dismiss Lewis' first amended complaint.   In its motion, the United States requests the

Court dismiss the action because the time for Lewis to bring his claim has run, divesting this Court of jurisdiction to hear the case.  The United States alternatively requests the Court dismiss Lewis' first amended complaint for failure to state a claim upon which relief can be granted.

## II.    <u>STANDARD OF REVIEW</u>

The United States requests the Court dismiss Lewis' first amended complaint pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.  When considering a motion to dismiss, the Court must generally construe the complaint liberally and assume all factual allegations to be true.  <u>Eckert v. Titan Tire Corp.</u>, 514 F.3d 801, 806 (8th Cir. 2008).  Dismissal will not be granted unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would entitle plaintiff to relief.

Rule 12(b)(1) of the Federal Rules of Civil Procedure governs challenges to subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  In its motion to dismiss, the United States contends this Court lacks jurisdiction over the matter because the statute of limitations under the Quiet Title Act has run.  According to the United States, the statute of limitations has run because the QTA statute of limitations was triggered by either (1) the Exchange Deed and Patent conveying the property at issue from the United States to Lewis' predecessors in interest or (2) a conversation between William Lewis and a government employee in 1992 regarding a potential mineral trespass.

Here, the United States asserts both of its legal arguments challenging the Court's jurisdiction are factual challenges.  However, Lewis contends the United States' jurisdictional challenge based upon its contention the QTA limitation period was triggered by the Exchange Deed and Patent is a facial challenge to the Court's jurisdiction, while the United States' contention the limitation period was triggered by the 1992 conversation is a factual challenge.

In a *factual* 12(b)(1) motion, the trial court's jurisdiction – its very power to hear the case – is at issue, and the trial court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990). As a result, "no presumptive truthfulness attaches to the plaintiff's allegations" and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 744 (8th Cir. 2001). The burden is on the plaintiff to demonstrate jurisdiction exists. Id. Whereas, when a challenge to the court's jurisdiction is a *facial* challenge, the court must "accept all factual allegations in the pleadings as true." Hastings v. Wilson, 516 F.3d 1055, 1058 (8th Cir. 2008). For its analysis examining whether the Exchange Deed and Patent triggered the QTA limitation period, distinguishing whether the challenge is factual or facial is a purely academic inquiry: It does not matter whether the Court freely weighs the evidence or accepts the factual allegations in the pleadings as true, for the Court would reach the same conclusion under either standard.

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is more than a "sheer possibility." Id. A complaint is sufficient if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The court must accept all factual allegations as true, except for legal conclusions or "formulaic recitation of the elements of a cause of action." Id. at 681. Detailed factual allegations are not necessary under the Rule 8 pleading standard, rather a plaintiff must set forth grounds of its entitlement to relief which "requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders a naked assertion devoid of further factual enhancement." <u>Ashcroft</u>, 556 U.S. at 678. The determination of whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling plaintiff to relief. <u>Ulrich v. Pop Cnty</u>, 715 F.3d 1054, 1058 (8th Cir. 2013).

The pleading standard under Rule 12(b)(6) contemplates that plaintiffs will often be unable to prove definitely the elements of the claim before discovery, particularly in cases where the necessary information is within the control of the defendants. <u>Ash v. Anderson Merchandisers, LLC</u>, 799 F.3d 957, 961 (8th Cir. 2015). The pleading standard only requires the plaintiff allege sufficient facts to state a plausible claim. <u>Id.</u>

## III.   <u>LEGAL ANALYSIS</u>

Lewis' complaint was brought pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.  In his first amended complaint, Lewis seeks to quiet title to the scoria located on specific tracts of land in McKenzie County, North Dakota, namely:  (a) S½ of Section 22, Township 147 North, Range 103 West and (b) NE¼, N½ NW¼, SE¼NW¼, E½SW¼, and W½SE¼ of Section 27, Township 147 North, Range 103 West.   In the pending motion, the United States requests the Court dismiss Lewis' first amended complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because the Plaintiff's claim is untimely and, consequently, this Court lacks jurisdiction over the matter.  Alternately, the United States requests the Court dismiss Lewis' first amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because Lewis has failed to state

a claim upon which relief can be granted as the Exchange Deed and Patent conveying property from the United States to Lewis' predecessors in interest reserved the scoria in favor of the United States as a matter of law. The Court begins by addressing whether this Court has jurisdiction over Lewis' claims.

### A.   Quiet Title Act Statute of Limitations

In the pending motion, the United States requests the Court dismiss the first amended complaint because Lewis' claim is untimely under the Quiet Title Act and, consequently, this Court lacks jurisdiction over the matter. The Plaintiff contends his claim is timely as his complaint was filed within the twelve (12) year statute of limitations of the Quiet Title Act and the Court has jurisdiction over the matter.

The United States is immune from suit absent a waiver of sovereign immunity. Hart v. United States, 630 F.3d 1085, 1088 (8th Cir. 2011). The Quiet Title Act ("QTA") provides a limited waiver of sovereign immunity:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest of water rights.

28 U.S.C. § 2409a(a). The QTA is the exclusive means by which an adverse claimant can challenge the United States' title to real property. Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983). "Because the QTA waives the government's sovereign immunity from suit, a plaintiff must comply with the limitations period to effectuate that waiver. Hence the QTA statute of limitations acts as a jurisdictional bar unlike most statutes of limitations,

which are affirmative defenses." Spirit Lake Tribe, 262 F.3d at 737-38 (internal citations omitted).[2]

Subsection (g) of 28 U.S.C. § 2409a, describes the statute of limitations applicable to claims brought by persons or entities other than the states:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such actions shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g). In *Spirit Lake Tribe*, the Eighth Circuit discussed the operation of the statute of limitations of subsection (g). Specifically the Eighth Circuit stated that subsection (g) does not require the government to provide explicit notice of its claim. Spirit Lake Tribe, 262 F.3d at 738. In fact, the government's claim need not be "clear and unambiguous." Id. (citing North Dakota *ex rel.* Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1313 (8th Cir. 1986). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Id. (quoting Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980)).

The Court is then tasked with determining whether Lewis complied with the limitations period of the QTA to effectuate a waiver of sovereign immunity by the United States. Because Lewis instituted this action on August 17, 2020, his attempt to quiet title is barred if he, or a

---

[2] As this Court has previously noted, some circuit courts of appeal have questioned whether the QTA's limitations period serves as a jurisdiction bar. In *Irwin v. Dep't of Veteran Affairs*, the United States Supreme Court concluded the statute of limitations in an employment discrimination action against the United States was subject to equitable tolling. 498 U.S. 89, 95-96 (1990). Courts have interpreted *Irwin* to imply a statute of limitations does not function as a jurisdictional bar for claims against the United States. See e.g., Wisconsin Valley Improvement Co. v. United States, 569 F.3d 331, 334 (7th Cir. 2009). For example, in *Schmidt v. United States*, the Eighth Circuit concluded the statute of limitations in the Federal Tort Claims Act is not jurisdictional pursuant to the Supreme Court's holding in *Irwin*. 933 F.2d 639, 640 (8th Cir. 1991). Nonetheless, absent an express contrary manifestation by the Eighth Circuit or the United States Supreme Court, this Court follows the Eighth Circuit's determination in *Spirit Lake Tribe* that the QTA's statute of limitations serves as a bar to the district court's jurisdiction. See 262 F.3d at 737-38

predecessor in interest, knew or should have known of the United States' adverse claim to the scoria by August 17, 2008.  See Doc. No. 1.

The trigger to start the QTA limitations period has been described as an "exceedingly light one."  Kane Cnty. v. United States, 772 F.3d 1205, 1215 (10th Cir. 2014) (quoting George v. United States, 672 F.3d 942, 944 (10th Cir. 2012).[3]  Courts have consistently held all that is necessary to trigger the QTA general limitation period in subsection (g) is a "reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Knapp, 636 F.2d at 283; see, e.g., Kane Cnty., 772 F.3d at 1215; Michel v. United States, 65 F.3d 130, 131-32 (9th Cir. 1995); and North Dakota ex rel Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1313 (8th Cir. 1986).

The United States contends the QTA limitation period has run here because the Exchange Deed and Patent transferring real property from the United States to Lewis' predecessors in interest provided those predecessors in interest with notice of the United States' claim to the scoria on the lands subject to the Exchange Deed and Patent.  The United States also contends a communication from a Forest Service employee to Lewis' father, and predecessor in interest, in 1992 triggered the statute of limitations.  According to the United States, since Lewis' predecessors in interest had actual notice of the United States' claims to the scoria, when Lewis acquired the lands in 2004, he had constructive notice – thereby creating another event triggering the QTA limitation period.

### 1.  Exchange Deed and Patent

The Court first addresses the United States' contention the Exchange Deed of June 18, 1956, between the United States and Glenn and Ellen McRae and the Patent of August 6, 1956,

---

[3] In Kane County, the Tenth Circuit described the trigger for the limitations period as an "exceedingly light one" in its discussion of the contours of both the limitations period of Section 2409a(i) applicable to the states and the general limitations period in subsection (g).  See Kane Cnty., 772 F.3d at 1215.

triggered the QTA limitations period.  On June 18, 1956, the United States granted the SW¼, N½ SE¼, and SW¼SE¼ of Section 22, NW¼NW ¼ of Section 26, and the NE¼, N½NW¼, SE¼NW¼E ½SW¼, and W½SE¼ of Section 27 in Township 147 North, Range 103 West to Glenn McRae and Ellen McRae by Exchange Deed pursuant to the BJFTA.  The Exchange Deed reserved to the United States "all coal, oil, gas and other minerals, including sand, gravel, stone, clay and similar materials. . . ."  See Doc. No. 11-1, p. 4.   The SE¼SE¼ of Section 22, Township 147 North, Range 103 West was then patented to Glen McRae and Ellen McRae under the BJFTA on August 6, 1956.  See Doc. No. 17-4.  The Patent reserved to the United States "all coal, oil, gas and other mineral in or under said lands, as authorized by the provision of Section 44 of said Act." See Doc. No. 16-2, p. 18.

According to the United States, these conveyances triggered the statute of limitations because they placed Glenn and Ellen McRae "on notice of the United States' asserted interest in the scoria."  See Doc. No. 11, p. 13.  More specifically, the United States contends these conveying documents placed the McRaes on notice of the United States' claim to the scoria because the Eighth Circuit has previously held "a[s] a matter of law" a deed or other conveyance document is sufficient to place a landowner on notice to trigger the QTA statute of limitations.  Id. at 13-14. For such a proposition, the United States cites the case of Spirit Lake Tribe, 262 F.3d at 738-39. Lewis disagrees with the United States' position, asserting Spirit Lake Tribe does not stand for the broad proposition that any deed or conveying document can serve as notice to trigger the QTA limitations period.

In Spirit Lake Tribe v. North Dakota, 262 F. 3d at 737, the Eighth Circuit was tasked with determining whether the district court correctly concluded Spirit Lake Tribe's claim against the United States to quiet title to Devils Lake, a freshwater lake located in northeastern North Dakota,

was time barred.  Spirit Lake Tribe contended its ownership of Devils Lake originated in an 1867 treaty which established the Fort Totten Reservation.  Id. at 736.  The United States disputed Spirit Lake Tribe's claim to Devils Lake, asserting Devils Lake was not included in the 1867 treaty and the federal government held title to Devils Lake until 1889, when it conveyed the lake to the State of North Dakota (at its statehood) under the equal footing doctrine.  Id.

After the district court held Spirt Lake Tribe's suit against the United States was time-barred, the Eighth Circuit upheld the decision, concluding the Spirit Lake Tribe knew or at least should have known of the United States' claim to Devil's Lake at least twelve (12) years prior to the filing of the complaint.  The Eighth Circuit concluded Spirit Lake Tribe knew or should have known the federal government's claim because the State of North Dakota deeded more than 62,000 acres of the lake to the federal government by quitclaim deed to assist in building the Garrison Diversion Project in 1971, nearly fifteen (15) years prior to the initiation of the action.  Id. at 738. The Eighth Circuit discussed how local news outlets widely reported the Garrison Diversion Project and that Spirit Lake Tribe "apparently knew of the government's land acquisition because a 1970 tribal resolution expressed concern about land ownership in view of the 'coming Garrison Diversion Project.'"  Id.  Thus, the Eighth Circuit had "little doubt that the Tribe was aware of the Garrison Diversion Project generally, and the government's acquisition of a portion of the lake specifically."  Id. at 738.  The Eighth Circuit went one step further in its analysis and concluded the 1971 quitclaim deed from the State of North Dakota to the United States, coupled with the evidence that Spirit Lake Tribe knew the extent of the Garrison Diversion Project, convinced the Court that Spirit Lake Tribe "knew or should have known" in 1971 of the federal government's claim to Devils Lake.  Thus, according to 28 U.S.C. § 2409a(g), Spirit Lake Tribe's claim was time barred as its claim was filed in 1968.

The United States posits the Eighth Circuit's decision in *Spirit Lake Tribe* stands for the broad proposition that "a[s] a matter of law" a deed or other conveying document is sufficient to place a landowner on notice to trigger the QTA statute of limitations.  The Court wholly rejects such an overly broad application of *Spirit Lake*.  The Eighth Circuit did not hold *as a matter of law* that a deed or other conveying document could place a landowner on notice of an adverse claim by the United States to trigger the QTA limitation period.  Instead, the Eighth Circuit concluded Spirit Lake Tribe's claim was time barred under the QTA because it was aware, or at least should have been aware, of the federal government's claim.  The Spirit Lake Tribe was aware of, or should have been aware of, the United States' claim to the lake because the quitclaim deed *evidenced* the United States' position that the State of North Dakota owned Devils Lake until North Dakota deeded the lake to the federal government for the Garrison Diversion Project.

The Court finds the facts and legal posture of *Spirt Lake* inapposite to the posture of this matter.  Nothing in *Spirit Lake* stands for the proposition that a document conveying an interest in property from the United States to a conveyee, even with certain reservations, puts the conveyee on notice of the United States' adverse interest in the conveyed property interest.  Therefore, the Court concludes *Spirit Lake* does not dictate that as a matter of law that the Exchange Deed of June 18, 1956, and the Patent of August 6, 1956, placed the Lewis' predecessors in interest on notice of the United States' claim to the scoria as to trigger the QTA limitation period.

In a similar vein, the United States contends the reservations in the Patent and Exchange Deed were sufficient to, at a minimum, put the Plaintiff's predecessors in interest on notice of the United States' adverse claim to the scoria.  According to the United States, the Patent clearly reserves all minerals as required by Section 44 of the BJFTA and the Exchange Deed "unmistakably reserves the scoria for the United States" based upon its interpretation of the

Exchange Deed. Lewis contends the language of the Patent and Exchange Deed did not trigger the limitations period because the reservations are ambiguous.

In *Patterson v. Buffalo National River*, the Eighth Circuit was tasked with determining whether the language of a quitclaim deed triggered the QTA statute of limitations. 76 F.3d 221, 223 (8th Cir. 1996). In *Patterson*, the plaintiffs' predecessors in interest owned a 159.49-acre tract of land. In 1976, the plaintiffs' predecessors in interest conveyed the north 79.49 acres to the United States by quitclaim deed. The deed conveyed acreage to the United States for the purpose of incorporating that acreage into the Buffalo National River project. The deed also purported to quitclaim all of the grantor's interest "in any means of ingress or egress." Id. At the time of the transfer, a road providing access to adjoining property traversed the property deeded to the United States. The plaintiffs later purchased the south 80 acres and the deed purported to include an easement by necessity across the United States' 79.49 acres. Years later, the plaintiffs requested use of a roadway across the United States' property to access their property, but the Forest Service denied the request. The plaintiffs then brought suit to quiet title to the easement. The United States contended the suit was time-barred. The district court agreed and concluded the language of the quitclaim deed triggered the limitations period because the language of the deed releasing to the United States "any means of ingress or egress" was sufficient notice of the United States' claim to the property. Id. at 224.

The Eighth Circuit reversed the district court's decision, concluding the language of the deed did not trigger the QTA's statute of limitations. Id. While the Eighth Circuit acknowledged a party is certainly placed on notice (for the purposes of QTA limitations period) when that party enters into an agreement that acknowledges a claim by United States, the court concluded "the restrictions contained in the 1976 deed were at best too ambiguous to place the [plaintiffs] on

notice of the government's claim." Id.  The Court then considered the language of the deed in light of state law as well as extrinsic evidence of the parties' intent.  Concluding that state law would interpret the language of the deed to reserve an easement across the land conveyed to the United States and extrinsic evidence showed the plaintiffs' predecessors in interest believed their property would not be "land-locked" upon completion of the sale, the Eighth Circuit concluded "[t]he only reasonable conclusion that a factfinder could come to, therefore, is that the [plaintiffs' predecessors in interest] could not have had a reasonable awareness in 1976 that the government would claim the right to block access to their land." Id. at 224.

Pursuant to *Patterson*, whether a plaintiff should have known of the United States' adverse interest is governed by a "test of reasonableness."  76 F.3d at 224.  The Tenth Circuit adopted a similar approach in *Poverty Flats Land & Cattle Co. v. United States*, 706 F.2d 1078 (10th Cir. 1983) ("*Poverty Flats*") when it determined a patent with a mineral reservation in favor of the United States did not sufficiently provide notice to the plaintiff's predecessor in interest to trigger the QTA limitations period.  The patent at issue reserved to the United States the right to "all mineral deposits in the land so patented, and to it, or persons authorized by it, the right to prospect, mine, and remove such deposits from the same under applicable law." Id. at 1079.  Shortly after a lessee of the United States began removing dirt, rock, and caliche from its property, the plaintiff filed suit seeking a declaration the United States had no interest in these materials.  On appeal to the Tenth Circuit, the question presented was whether the language of the Patent, namely the reservation in favor of the United States, triggered the QTA limitation period.  The Tenth Circuit began its analysis by clarifying the issue:

> If [the plaintiff was] seeking a declaration that the mineral deposit reservation was invalid, the action would be time-barred by the recitation in the patent, of which [the plaintiff] would have at least constructive notice.  But [the plaintiff] declares that it is not contesting the government's rights to "mineral deposits" within the

terms of the deed reservation.  Rather, this is a dispute over the meaning of the language in the patent conveying the land:  [the plaintiff] contends that under a proper construction of the instrument dirt, rock, and caliche were not reserved to the government.

Id. at 1079.  In *Poverty Flats*, there was no case on point that decided whether caliche[4] was within the scope of a mineral reservation like the one at issue.  Id. (discussing cases that concluded other materials were or were not minerals under federal statutes).  Given the unsettled state of the law, the Tenth Circuit concluded "a material issue of fact exists as to whether the plaintiff knew or should have known of the claim of the United States to dirt, rock, and caliche at the time the mineral reservation was executed."  Id. at 1080.

Drawing upon the analysis in *Poverty Flats* and *Patterson*, the Court cannot conclude at this stage that the Patent and Exchange Deed triggered the QTA limitations period.  Neither the language of the Exchange Deed nor the Patent articulated that scoria specifically was reserved to the United States, instead the conveying documents reserved coal, oil, gas, and other minerals to the United States.  To review, the language of the Exchange Deed reserved to the United States "all coal, oil, gas and other minerals, including sand, gravel, stone, clay and similar materials. . . ."  See Doc. No. 11-1, p. 4.  The Patent reserved to the United States "all coal, oil, gas and other mineral in or under said lands, as authorized by the provision of Section 44 of said Act."  See Doc. No. 16-2, p. 18.  While the Exchange Deed provided examples of minerals ("including sand, gravel, stone, clay, and similar materials") and the language of the Patent was defined by the provisions of Section 44 of the BJFTA, the language of the documents is at best ambiguous as to whether scoria is included in the reservations.  See Patterson, 76 F.3d at 224.  The parties devote a substantial amount of paper in their briefs addressing whether scoria is a mineral as defined in

---

[4] In *Poverty Flats*, the only issue before the Tenth Circuit was whether the caliche was within the scope of the mineral reservation as the United States had conceded dirt and rock were not included in the mineral reservation. 706 F.2d at 1078.

the Patent and Exchange Deed.  While not deciding the issue, the Court certainly acknowledges the law concerning whether scoria is a mineral within the Patent and Exchange Deed is not crystal clear.  Moreover, at the time the Exchange Deed and Patent were executed, under North Dakota law, a reservation of minerals covered oil, gas and related hydrocarbons, coal, sulphur, iron, uranium, and any other mineral – but a mineral reservation did not include gravel, clay, or scoria. George v. Veeder, 2012 ND 186, ¶ 8. Therefore, it is not reasonable to charge the Lewis' predecessors in interest with knowledge of the United States' claim to scoria when the language is ambiguous as to whether scoria is included in the reservations.  Patterson, 76 F.3d at 224. Accordingly, the Court cannot conclude the mineral reservations in the Exchange Deed or Patent triggered the QTA statute of limitations.  From this conclusion, it follows that the Plaintiff cannot be charged with imputed notice of the Government's claim to the scoria when he acquired the lands.

### 2.  March 5, 1992 Emails

The Government next contends a conversation between Jess Ann Knutson, an employee with the Forest Service, and Bill Lewis, the Plaintiff's father and predecessor in interest, triggered the QTA limitation period.  According to the Government, during the conversation between Jess Ann Knutson and Bill Lewis, Knutson informed Bill Lewis the United States owns the scoria on the real property at issue.  The United States posits this conversation triggered the QTA statute of limitations when it took place on March 5, 1992 – more than 12 years before this action was commenced.  Thus, according to the United States, the QTA statute of limitations has run, and this Court lacks jurisdiction over the matter.

In support of its contention, as evidence of the conversation, the Government submitted an email string between Patricia Proebstel and Jess Ann Knutson, both employees of the Forest Service, dated May 5, 1992.  See Doc. No. 11-3.  The email string contains an email from Jess Ann Knutson to Patricia Proebstel, which states:

> Thanks for your help in tracking this down Pat.  We don't have a file on this exchange in our office, maybe Hank would have something in the SO.  I visited with Norm Smyers in the SO this morning and his position is the same – the U.S. owns the scoria.  ***I also visited with Bill Lewis (the landowner) and told him the same thing.***  He seemed to accept that and has told the County Road Department they could get scoria from another piece of property he owns.

See Doc. No. 11-3, p. 2 (emphasis added).  The email string also included an earlier email from Patricia Proebstel to Jess Ann Knuston, stating:  "I have talked with Mike Burnside and Ray TeSoro – minerals folks in RO – and their opinion is that the reservation in the exchange deed DOES INCLUDE SCORIA." Id. at 3 (emphasis in original).  While the Government indicates in its briefing that Jess Ann Knutson met with Bill Lewis in person at the property at issue on March 5, 1992, the Government's argument fundamentally rests on one sentence in Jess Ann Knuston's email to Patricia Proebstel:  "I also visited with Bill Lewis (the landowner) and told him the same thing" as evidence of a conversation notifying Bill Lewis of the United States' claim to the scoria.  See Doc. No. 11-3, p. 2   The email does not indicate when Jess Ann Knuston "visited" with Bill Lewis (the Court presumes the conversation occurred prior to March 5, 1992).  Further, the email does not indicate whether Jess Ann Knutson spoke with Bill Lewis in person or by telephone.  The email also does not evince the specific language Jess Ann Knutson used when she "visited" with Bill Lewis.

The Plaintiff contends any conversation between Jess Ann Knuston and Bill Lewis cannot trigger the QTA limitations period because (1) the email evidence is inadmissible, (2) the conversation was insufficient notice to Bill Lewis of the United States' claim to the scoria because

Jess Ann Knutson was a low-level Forest Service employee without authority to form or communicate a formal position of the United States, and (3) the United States never adopted the opinion expressed by Jess Ann Knutson.  For the purposes of this motion only, the Court assumes, *arguendo*, the email string (Doc. No. 11-3) would be admissible at trial and for the purpose of considering whether the Court has jurisdiction.  Consequently, the Court turns to the Plaintiff's second contention that any conversation between Bill Lewis and Jess Ann Knuston, a low-level Forest Service employee without authority to form or communicate a position of the United States, was insufficient notice of the United States' claim to the scoria.

Subsection (g) of 28 U.S.C. § 2409a dictates that QTA "actions shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  28 U.S.C. § 2409a(g).  Subsection (g) does not require the government to provide explicit notice of its claim.  Spirit Lake Tribe, 262 F.3d at 738.  "Knowledge of the claim's full contours is not required.  What is necessary is "a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  Id. (quoting Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980)).  The QTA contains two limitations periods:  one applicable to a State bringing a QTA action and one applicable to anyone else bringing a QTA action. Subsection (g) outlines the events necessary to trigger the statute of limitations for actions brought by non-States, while subsection (k) of § 2409a describes that the notice for the purposes of the accrual of an action brought by a State shall be:

> (1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or

> (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

28 U.S.C. § 2409a(k).  While the language of subsection (k) provides specific forms of notice that trigger the QTA limitations periods for actions brought by the States; the statutory language of subsection (g) does not define what form of notice is required to indicate a plaintiff (or predecessor in interest) knew or should have known of the United States' claim.  Instead of dictating specific forms of notice to trigger the QTA limitations period, the operative words of subsection (g) -- "should have known" import a test of reasonableness. Amoco Production Co. v. United States, 619 F.2d 1383, 1388 (10th Cir. 1980); see also Knapp, 636 F.2d at 283.  The question for the Court to consider then is whether it was "reasonable" for Bill Lewis, the Plaintiff's predecessor in interest, to know of the United States' claim to the scoria for the limitations provision of 28 U.S.C. § 2409a(g) to become operative.

It is the opinion of the Court that Lewis' predecessor in interest cannot be reasonably expected to know of the United States' claim to the scoria based solely upon a verbal statement made by a Forest Service employee.  Any verbal communication between Bill Lewis, the Plaintiff's predecessor in interest, does not appear to have been memorialized in a letter or other writing directed to Bill Lewis.  While the Court does not read subsection (g) to require the United States' claim to the scoria be communicated in writing, it is not judicious here to conclude an individual is reasonably aware of an adverse claim by the United States in a property interest absent *any* form of written communication.  Under the circumstances, it is simply not reasonable to charge Bill Lewis, the predecessor in interest, with notice of the United States' claim to the scoria based solely upon a verbal communication, of which the details of such communication are not memorialized.  This is particularly true here when the United States took no formal action regarding its claim to the scoria until 2012.  In October of 2012 a representative of the United States Bureau of Land Management ("BLM") visited Lewis' property to discuss a possible mineral

trespass.  See Doc. No. 14, ¶ 28.  Lewis then received a letter from the BLM regarding the suspected mineral materials (specifically scoria) trespass in which the BLM states "the United States is the owner of all minerals in the S½ sec. 22, T. 147, R. 130 W."  See Doc. No. 17-16. Had a similar letter or other written communication occurred in 1992 following any verbal conversation between Jess Ann Knutson and Bill Lewis, then it would be reasonable to charge Bill Lewis with knowledge of the United States' claim to the scoria at issue, thus triggering the limitations period.

The Court is also unpersuaded a low-level employee from the Forest Service can articulate the position of the United States, particularly in a verbal communication.  In *North Dakota v. United States*, this Court similarly concluded North Dakota could not be reasonably expected to rely upon a statement in a "letter from a local ranger to county commissioners as an 'official statement of United States policy.'" North Dakota v. United States, 257 F. Supp. 3d 1039, 1067 (quoting Utah v. United States, 624 F. Supp 622, 626 (D. Utah 1983), *rev'd*, 492 U.S. 193 (1987)). While the Court applied the limitation triggers outlined within subsection (k) in *North Dakota*, this Court is guided by the same underlying principle of reasonableness now as it was then.  Id.  See also Amoco Production Co., 619 F.2d at 1388.  Moreover, as mentioned above, it is clear from the record Jess Ann Knutson was an employee with the Forest Service when she sent the March 5, 1992 email regarding her verbal communication with Bill Lewis.  The Court is unsure, based upon its thorough review of the record before it, what authority Knutson had over the lands at issue. Accordingly, the Court cannot conclude Bill Lewis, the Plaintiff's predecessor in interest, knew or should have known of the United States' claim to the scoria at issue to trigger the QTA limitation period.  See 28 U.S.C. § 2409a(g).

**B.      Request to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)**

The United States alternatively contends the Court should dismiss the Lewis' claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  More specifically, the United States claims that dismissal pursuant to Rule 12(b)(6) is appropriate because the question of who owns the scoria at issue is settled under both federal and North Dakota law,  with case law squarely deciding the United States owns the scoria.  Thus, according to the United States, because the law is settled and Lewis is not the owner of the scoria, the amended complaint must be dismissed pursuant to 12(b)(6).  Lewis disagrees with the United States' position.

Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted.  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In support of its contention the amended complaint should be dismissed pursuant to Rule 12(b)(6), the United States argues that the United States Supreme Court's holding of *Watt v. Western Nuclear, Inc.*, 462 U.S. 36 (1983), extends to this dispute such that the minerals reservations in both Exchange Deed and Patent include the scoria.  However, the Court is not convinced the holding of *Western Nuclear* squarely decides whether scoria is a "mineral" reserved in the Exchange Deed and Patent issued pursuant to the BJFTA.  Moreover, even if this Court were to conclude, *arguendo*, the reasoning of *Western Nuclear* extends to the conveying documents here, dismissal pursuant to Rule 12(b)(6) is unwarranted.

In *Western Nuclear*, the United States Supreme Court addressed "whether gravel found on lands patented under the [Stock-Raising Homestead Act ("SRHA")] is a mineral reserved to the United States."  462 U.S. at 37.  The specific language at issue in *Western Nuclear* was contained

within Section 9 of SRHA, which states that "[all] entries made and patents issued . . . shall be subject to and contain a reservation to the United States of all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same." Id. at 38-39.  To determine whether gravel is a mineral as defined under the SRHA, the Supreme Court looked to the language of the SRHA, the purpose of the SRHA, as well as contemporaneous legal sources which defined the term "minerals" to determine whether Congress intended to include gravel as a "mineral." Id. at 44-53.  While the Supreme Court did not find the dictionary or legal definition of "mineral" at the time of SRHA's passage instructive as to the term's definition in the SRHA, the Court found the underlying purpose of the SRHA strongly supported gravel to be included in SRHA mineral reservation.  The Supreme Court discussed the purpose of the mineral reservation of the SRHA:

> Congress' underlying purpose in severing the surface estate from the mineral estate was to facilitate the concurrent development of both surface and subsurface resources.  While Congress expected that homesteaders would use the surface of SRHA lands for stockraising and raising crops, it sought to ensure that valuable subsurface resources would remain subject to disposition by the United States, under the general mining laws or otherwise, to persons interested in exploiting them.  It did not wish to entrust the development of subsurface resources to ranchers and farmers.  Since Congress could not have expected that stockraising and raising crops would entail the extraction of gravel deposits from the land, the congressional purpose of facilitating the concurrent development of both surface and subsurface resources is best served by construing the mineral reservation to encompass gravel.

Id. at 46-47.

Ultimately, in light of Congress' understanding that the surface of SRHA lands would be used for stockraising and crop raising, the Supreme Court interpreted the mineral reservation in the SRHA included: (1) substances that are mineral in character (i.e. substances that are inorganic), (2) that can be removed from the soil, (3) that can be used for commercial purposes, and (4) that there is no reason to suppose were intended to be included in the surface estate.  Id. at 53.  The

Supreme Court was convinced the scope of the mineral reservation in the SRHA included gravel because gravel could be "taken from the soil and used for commercial purposes" and "[s]tockraising and raising crops do not ordinarily involve the extraction of gravel from a gravel pit." Id. at 55-56.

The United States contends the Supreme Court's analysis in *Western Nuclear* squarely applies in this case and under *Western Nuclear* the amended complaint must be dismissed. While the Court finds the analysis of *Western Nuclear* instructive, the holding of *Western Nuclear* has been narrowly construed by the Supreme Court in more recent years.  See BedRoc Limited, LLC v. United States, 541 U.S. 176, 183 (declining to extend the holding of *Western Nuclear* to conclude sand and gravel are valuable minerals under the Pittman Act). Moreover, in *Western Nuclear*, the federal statute at issue was the SRHA and the federal statute at issue here is the BJFTA.  The substance at issue in *Western Nuclear* was gravel, while the substance at issue is scoria.  While Western Nuclear provides the Court with a roadmap for any substantive analysis, the case alone does not decide whether scoria was reserved to the United States in the Exchange Deed and Patent at issue.  In fact, neither the parties nor this Court have identified any decision by any court in this country which has considered the scope of the mineral reservation in the BJFTA or conveying documents executed pursuant to the BJFTA, the federal statute under which the lands at issues were conveyed to Lewis' predecessor in interest.

Even if the Court were to extend the rationale of *Western Nuclear* to the case at bar, the Court would need to examine the character of scoria, whether scoria can be removed from the ground, whether it can be used for commercial purposes, the purpose of the particular statute at issue (i.e. BJFTA), and whether Congress intended scoria to be included in the surface estate.

Therefore, the Court cannot conclude the Plaintiff has failed to state a claim upon which relief can be granted to justify dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, "The United States' Motion to Dismiss Plaintiff's Amended Complaint" (Doc. No. 16) is **DENIED**.  The Court further **FINDS AS MOOT** the Plaintiff's motion for oral argument (Doc. No. 23).

**IT IS SO ORDERED**.

Dated this 25th day of January, 2022.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court